

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:FJN
F. #2020R00621

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 5, 2020

<u>By E-Mail and ECF</u>

The Honorable Steven M. Gold
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Jeremy Trapp</u>
     <u>Magistrate Docket No. 20-M-626</u>

Dear Judge Gold:

  Later today, defendant Jeremy Trapp ("Trapp") is scheduled to be presented before Your Honor on the above-referenced complaint. For the reasons set forth below, the government respectfully requests that the Court enter a permanent order of detention because Trapp presents a danger to the community and is a flight risk.

I. <u>The Offense Conduct</u>[1]

  Beginning on or about July 13, 2020, and continuing through on or about July 17, 2020, Trapp engaged in a series of conversations with an individual who was a confidential source for the NYPD (the "CS"), culminating in Trapp's efforts to cut the brake lines on an NYPD vehicle.[2] During these conversations, Trapp expressed his desire to hurt law enforcement officers by burning NYPD precincts and cutting the brake lines in police vehicles, steps that Trapp decided were necessary because he concluded that the non-violent demonstrations against law enforcement were ineffective at bringing about change. Trapp

---

[1] Detailed herein are a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. <u>See</u> <u>United States v. LaFontaine</u>, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings).

[2] The CS is a paid informant for the NYPD. The information provided by the CS has proven reliable in the past and has been corroborated by independent investigative techniques.

also expressed his desire to take down the Verrazzano-Narrows Bridge, which he claimed was necessary to prevent "white supremacists" who lived on Staten Island from traveling to Brooklyn.

In a conversation with the CS on or about July 13, 2020, Trapp stated that the police were racist, that he wanted to harm police officers and their supporters, and that he had previously been involved in destroying property and burning a police car. Trapp also stated that he wanted to cut the brake lines on police cars.

On or about the night of July 15, 2020, the CS picked up Trapp at Trapp's home in Brooklyn, New York. Trapp and the CS talked as they drove around Brooklyn in the CS's vehicle during the evening of July 15, 2020 and into the early morning hours of July 16, 2020. During this conversation, Trapp told the CS that he wanted to "burn the [Verrazzano-Narrows] Bridge down" so that "white supremacists" could not use it to get to Brooklyn from Staten Island. Trapp also told the CS that he wanted to conduct reconnaissance of the Verrazzano-Narrows Bridge. Trapp reiterated to the CS that he wanted to harm police officers. Specifically, Trapp stated that the way to deal with police cars was to "cut their brakes off." Trapp questioned the point of burning a police car because the end result was only a burned car, but encouraged the CS that they needed to burn down NYPD precincts instead. Trapp and the CS agreed to meet later that day to take pictures of the Verrazzano-Narrows Bridge.

Later in the day on or about July 16, 2020, the CS and Trapp drove to the Brooklyn side of the Verrazzano-Narrows Bridge in the CS's vehicle, and Trapp took photographs of the bridge. Trapp then suggested that he and the CS drive around Brooklyn to look for police cars so that Trapp could cut their brake lines. While driving, Trapp and the CS saw various police cars but did not see any unattended ones, and ceased their search. When the CS later dropped Trapp off at Trapp's home in Brooklyn, they discussed meeting at a demonstration scheduled for the next day in Bay Ridge, Brooklyn. Trapp told the CS that the demonstrations were too non-violent and were not accomplishing anything. Trapp told CS that he wanted to cut the brake lines on police cars instead of going to the demonstration.

On or about July 17, 2020, the CS again drove to Trapp's home in Brooklyn and picked him up in the CS's vehicle. NYPD officers established surveillance of Trapp and the CS in advance of the meeting. While in the CS's vehicle, Trapp showed the CS his backpack, which contained, among other things, a scissor-like tool that could be used to sever a vehicle's brake lines.

At approximately 4:00 p.m. on July 17, 2020, Trapp and the CS approached a marked NYPD 2014 Chevrolet Express Van (the "NYPD Van") that was parked near 4th Avenue and 42nd Street in Brooklyn. The NYPD Van was marked "NYPD" and "POLICE" in multiple areas, and bore visible police lights. Trapp crawled under the NYPD Van and reached for something near one of the vehicle's wheel wells. The CS stood nearby acting as a purported "lookout." Trapp then crawled out from under the NYPD Van and left the area

with the CS.  Both the CS and the NYPD officers conducting surveillance captured this incident on video.  An image of Trapp under the NYPD Van is shown below.



      Trapp and the CS then got into the CS's vehicle, and the CS drove away from the NYPD Van.  The NYPD officers that had been surveilling Trapp and the CS followed in covert pursuit.  Trapp expressed excitement to the CS about having severed the brake line on the NYPD Van and stated that he wanted to do the same to more police cars.  Trapp and the CS drove around Brooklyn looking for other police vehicles to sabotage, and eventually drove to an encampment of protestors located near City Hall in Manhattan.  Trapp and the CS walked around the encampment, returned to the CS's vehicle, and drove back to Brooklyn.  The same NYPD officers kept Trapp under constant surveillance during this entire time, and arrested Trapp shortly after Trapp and the CS returned to Brooklyn.

      At the time of his arrest, Trapp was wearing the same clothes he was wearing when he crawled under the NYPD Van.  A search incident to arrest of Trapp revealed a scissor-like tool in Trapp's possession.  An image of Trapp after his arrest and of the tool he was carrying are shown below.





The NYPD transported the NYPD Van to a nearby facility for inspection shortly after Trapp emerged from under the vehicle. An inspection of the NYPD Van revealed that a line for a wheel speed sensor had been partially severed. An NYPD automobile mechanic has informed the FBI that the partially severed line is part of the NYPD Van's anti-lock braking system. A malfunctioning anti-lock braking system would adversely impact a driver's ability to stop and maintain control of the NYPD Van in an emergency. The NYPD mechanic also informed the FBI that the wheel speed sensor line looks similar to the NYPD Van's brake line and that it is located in the same area of the

4

NYPD Van. If the brake line had been severed in the same manner as the wheel speed sensor line, the driver of the NYPD Van would have been unable to use the vehicle's brakes. An image of the damage to the NYPD Van is shown below.



II.     Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Sections 3141 et seq., federal courts are instructed to order the pretrial detention of a defendant if, after a hearing, the judge "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g). As discussed below, these factors weigh heavily against pretrial release.

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C.

§ 3142(f)(2); see also LaFontaine, 210 F.3d at 130-31. In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted); see also United States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001) ("[The defendant] has twice been convicted of weapon possession--one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

III.     The Court Should Enter a Permanent Order of Detention

The factors to be considered in the detention analysis show that Trapp presents a danger to the community and a risk of flight if released on bond. Accordingly, the Court should enter a permanent order of detention for Trapp pending trial.

   A.     The Nature and Circumstances of the Offense Charged

Trapp's criminal conduct was extraordinarily dangerous to the community. Amid the largely peaceful demonstrations taking place across New York City, Trapp committed an act of potentially deadly sabotage. Trapp targeted the NYPD Van and then climbed under the vehicle to sever what he believed to be the vehicle's brake line.[3] Had Trapp succeeded in cutting the NYPD Van's brake line without being detected the results could have been tragic. Indeed, Trapp's conduct threatened the safety of multiple human lives, from police officers who attempted to drive the NYPD Van to members of the public who could have been the victim of an accident involving a vehicle with no functioning brakes.

Congress has recognized the seriousness of the charged offense by providing that acts of sabotage such as this carry a maximum term of 20 years' imprisonment. See 18 U.S.C. § 33. The prospect of a lengthy term of incarceration may reasonably incentivize the defendant to flee and thus establishes Trapp's status as a serious risk of flight. United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

   B.     The Weight of the Evidence

The weight of the evidence in this case is overwhelming. Trapp was caught on video sabotaging the NYPD vehicle in broad daylight. Moreover, the day before the incident, Trapp was recorded discussing his desire to injure officers by cutting the brakes on

---

[3]   As explained above, Trapp partially severed a line connected to the vehicle's anti-lock braking system, which would have affected the vehicle's braking power. Had Trapp severed the actual brake line—which appeared similar and was located in the same area—the vehicle would have been without functioning brakes.

6

their cars, burning police cars and burning down precincts. And when Trapp was arrested following the incident, he had in his possession the tool that he used to cut the line connected to the anti-lock braking system.

### C. Trapp's History and Characteristics

Trapp's conduct shows that he presents a danger to the community. He has shown—through his words and actions—that he is willing to violently attack police officers irrespective of whom he might hurt in the process. His efforts to cut the brake lines on an NYPD vehicle threatened the life and safety not only of the police officers who might have later driven that vehicle, but members of the public who could have been injured or killed by a crash involving a vehicle with no functioning brakes. Not only did Trapp try to cut the brake line, he told the CS after that he wanted to cut the brake lines on more NYPD vehicles.

More troubling, Trapp has shown a penchant for increasingly dangerous behavior. When Trapp met the CS, he admitted that he had already burned a police car and destroyed property—actions that cause harm to the civilian population. This was apparently not enough for Trapp because—according to him—when you burn a police car, all you end up with is a burned police car. Not content with destroying property in an inherently dangerous way, Trapp escalated his criminal conduct by planning over several days to cut the brake lines on police vehicles and inciting the CS to do the same. Simultaneously, Trapp was making plans to take down the Verrazzano-Narrows Bridge, in what he described as an effort to prevent "white supremacists" from traveling to Brooklyn from Staten Island. Trapp went so far as to conduct reconnaissance on the Bridge. The potential harm to innocent bystanders from any of his actions or planned actions did not deter Trapp.

Additionally, Trapp has already shown contempt for orders issued by this Court. On August 4, 2020, this Court issued an arrest warrant for Trapp on the instant charges. On August 5, 2020, FBI Special Agents went to Trapp's home to execute the arrest warrant. The FBI agents were wearing jackets and body armor that clearly identified them as FBI agents. Additionally, the agents announced their presence and told the occupants of the home, including Trapp, that they had an arrest warrant for Trapp. Nevertheless, Trapp resisted arrest and wrestled with FBI agents until multiple agents were able to physically restrain him with handcuffs.

### D. The Nature and Seriousness of the Danger to the Community Posed by Release

Trapp poses a severe and ongoing risk to the community. He has committed a sabotage attack and sought to convince others to engage in similar, as well as more dangerous, attacks. Amid the ongoing social unrest in New York City, the government respectfully submits that Trapp, if placed on pretrial release, would return to endangering police officers and civilians, as Trapp has already indicated his desire to cut the brake lines on more NYPD vehicles. There is no reason the Court should give Trapp the benefit of the doubt that he will respect the Court's orders regarding terms of pretrial release.

IV.    <u>Conclusion</u>

        In summary, Trapp presents a danger to the community and a risk of flight that no set of release conditions can mitigate. For all of the foregoing reasons, the government submits that there is no set of conditions that will reasonably assure Trapp's appearance or the safety of the community, and the government respectfully submits that the Court should thus enter a permanent order of detention pending trial.

        Respectfully submitted,

        SETH D. DuCHARME
        Acting United States Attorney

By:    _____
        Francisco J. Navarro
        Assistant United States Attorney
        (718) 254-7000

cc:    Clerk of Court (by ECF)